

1
2
3
4
5
6
7      UNITED STATES DISTRICT COURT
8    FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
10   MORTGAGE GRADER, INC.,                )        CASE NO. SACV 13-00043 AG (ANx)
                                           )
11              Plaintiff,                 )
                                           )
12                                         )        ORDER GRANTING IN PART
     v.                                    )        DEFENDANTS' OMNIBUS MOTION
13                                         )        FOR SUMMARY JUDGMENT
                                           )
14                                         )
     COSTCO WHOLESALE                       )
15   CORPORATION, FIRST CHOICE             )
     LOAN SERVICES, INC., and NYLX,        )
16   INC.                                  )
                                           )
17              Defendants.                )
     ─────────────────────────────────    )
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Plaintiff Mortgage Grader, Inc. ("Plaintiff") alleges that Defendants Costco Wholesale Corporation ("Costco"), First Choice Loan Services, Inc. ("First Choice"), and NYLX, Inc. ("NYLX") (collectively, "Defendants") have infringed U.S. Patent Nos. 7,680,728 ("'728 Patent") and 7,366,694 ("'694 Patent"), both titled "Credit/Financing Process" (collectively, the "Asserted Patents" or "patents-in-suit"). (Second Am. Compl., Dkt. No. 33.) The Asserted Patents cover computer implemented systems and methods for online mortgage shopping.

On November 3, 2014, Defendants filed an omnibus motion for summary judgment of (1) invalidity of all asserted claims under 35 U.S.C. § 101, (2) noninfringement of the '728 Patent, (3) noninfringment of the '694 Patent, (4) no induced infringement by Costco, and (5) no infringement of method claims due to divided infringement ("Motion"). (Dkt. No. 99.) On November 17, 2014, Plaintiff filed an opposition ("Opposition"). (Dkt. No. 124.) On November 24, 2014, Defendants filed a reply ("Reply"). (Dkt. No. 131.)

The Motion is GRANTED IN PART and DENIED IN PART. Most significantly, the patents-in-suit fail 35 U.S.C. § 101.

**LEGAL STANDARD**

Summary judgment is appropriate where the record, read in the light most favorable to the non-moving party, shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156 (1970)).

The burden initially is on the moving party to show the absence of a genuine issue of material fact or that the non-moving party will be unable to make a sufficient showing on an essential element of its case for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. Only if the moving party meets its burden must the non-moving party produce evidence to rebut the moving party's claim. *Id.* If the non-moving party establishes the presence of a genuine issue of material fact, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

## ANALYSIS

### 1.    35 U.S.C. § 101 – PATENTABLE SUBJECT MATTER

#### 1.1    Legal Standard

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "[T]his provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The Supreme Court has "described the concern that drives this exclusionary principle as one of pre-emption." *Id.* That is, "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work," and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws. . . . *see* U.S. Const., Art. I, § 8, cl. 8 (Congress 'shall have Power . . . To promote the Progress of Science and useful Arts')." *Id.* (some internal citations, quotations, and modifications omitted).

3

1    "Accordingly, in applying the § 101 exception, we must distinguish between patents that

2    claim the 'buildin[g] block[s]' of human ingenuity and those that integrate the building blocks into

3    something more, thereby 'transform[ing]' them into a patent-eligible invention." *Id.* (citations

4    omitted).  The Supreme Court has established a two-part test to make that distinction.  "First, we

5    determine whether the claims at issue are directed to one of those patent-ineligible concepts.  If so,

6    we then ask, '[w]hat else is there in the claims before us?'" *Id.* at 2355 (quoting *Mayo Collaborative*

7    *Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)).  "To answer that question, we

8    consider the elements of each claim both individually and 'as an ordered combination' to determine

9    whether the additional elements 'transform the nature of the claim' into a patent-eligible

10   application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98).  "We have described step two of this analysis

11   as a search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient

12   to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible

13   concept] itself.'" *Id.* (quoting *Mayo*, 132 S. Ct. at 1294).

14    As the Court previously noted in *Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, No. SACV

15   11-00189 AG, 2014 WL 7012391, at *3 (C.D. Cal. Nov. 12, 2014), other judges of this Court have

16   recognized that the two steps of the *Alice/Mayo* test "are easier to separate in recitation than in

17   application." *Wolf v. Capstone Photography, Inc.*, No. CV 13-09573 CAS, Dkt. No. 49 at 17, 2014 U.S.

18   Dist. LEXIS 15627, at *29 (C.D. Cal. Oct. 28, 2014) (quoting *Eclipse IP LLC v. McKinley Equip. Corp.*,

19   No. SACV 14-00742 GW, 2014 WL 4407592, at *2-3 (C.D. Cal. Sept. 4, 2014) ("Describing this as a

20   two-step test may overstate the number of steps involved.")).  But it is clear that "the mere

21   recitation of a generic computer cannot transform a patent-ineligible abstract idea into a

22   patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

23    Recitation of generic computer implementation does not transform an abstract idea into

24   patentable subject matter because it is insufficient for patent eligibility purposes to either state an

25   abstract idea "while adding the words 'apply it'" or to limit the use of an abstract idea "to a

26   particular technological environment." *Id.* (quoting *Mayo*, 132 S. Ct. at 1294, *Bilski v. Kappos*, 561

27   U.S. 593, 610-611 (2010)).  "Stating an abstract idea while adding the words 'apply it with a

28   computer' simply combines those two steps, with the same deficient result.  Thus, if a patent's

4

1   recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a

2   computer,' that addition cannot impart patent eligibility." *Id.* (citations omitted).  Similarly, "the use

3   of the Internet is not sufficient to save otherwise abstract claims from ineligibility under § 101."

4   *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *CyberSource Corp. v. Retail*

5   *Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011) ("the use of the Internet to verify a credit card

6   transaction does not meaningfully add to the idea of verifying the transaction.")).

7

8       **1.2    Application**

9

10       Defendants argue that "[a]s in the *Alice Corp.* decision and its progeny, there is nothing novel

11   or otherwise patentable about the Asserted Claims."  (Mot. 5.)  This statement, focusing on novelty,

12   is perhaps an odd opening for a patentable subject matter attack.  It likely results from the Supreme

13   Court's emphasis in *Alice* and *Bilski* that the abstract idea at issue in each of those cases was "a

14   fundamental economic practice long prevalent in our system of commerce."  *Alice*, 134 S. Ct. at

15   2356; *Bilski*, 561 U.S. at 611.  When the Court emphasizes how long something has been around,

16   readers' minds naturally drift to the requirements of novelty and non-obviousness found in 35

17   U.S.C. §§ 102 and 103.

18       In fact, given (1) that the idea in *Alice* was old, and (2) "the ubiquity of computers," *Alice*, 134

19   S. Ct. at 2358, it seems that *Alice* could have been decided the same way under § 103.  But where the

20   abstract idea at the heart of the claim is new, the Supreme Court's exceptions to § 101's otherwise

21   sweeping coverage—"anything under the sun that is made by man," *Diamond v. Chakrabarty*, 447

22   U.S. 303, 309 (1980)—are much more important constraints.  In the case of a new abstract idea (or

23   newly discovered law of nature or physical phenomenon) the exceptions to § 101 aren't just

24   hammering a nail with a shoe.  They are tools uniquely capable of preventing or invalidating a patent

25   that otherwise passes §§ 102 and 103.

26       But the Supreme Court has not reserved § 101 for when §§ 102 and 103 fail.  Thus,

27   Defendants are justified in calling for a § 101 determination in this case.  And here, the § 101 shoe

28   fits.  The asserted claims are as follows:

*'728 Patent*

6. A method of assisting a borrower in obtaining a loan, the method comprising:

(a) receiving, over a network, personal information of a borrower, said personal information including financial information of the borrower, and including information regarding objectives of the borrower in seeking a loan, said personal information obtained, at least in part, via an online form completed by the borrower;

(b) selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower;

(c) programmatically generating the credit grading for the borrower using the selected underwriting criteria, wherein the selected underwriting criteria includes objective criteria used by one or more lenders capable of providing the loan;

(d) outputting information regarding the credit grading, and information regarding a plurality of lenders capable of providing the loan, to the borrower; and

(e) subsequently to steps (a)-(d), in response to receiving authorization from the borrower, sending the credit grading and at least some of the personal information of the borrower to a particular one of said lenders selected by the borrower;

wherein steps (a)-(e) are performed by a third party evaluator that does not provide the loan, and is performed such that none of the received personal information of the borrower is released to any of the lenders without specific authorization from the borrower, whereby the method enables the borrower to assess its borrowing ability and to select a lender for providing the loan without exposing any personal information to any of the lenders, wherein the method comprises the third party evaluator selecting and applying the underwriting criteria of a particular lender, as obtained confidentially from said particular lender.

*'694 Patent*

1. A computer-implemented system for enabling borrowers to anonymously shop for
loan packages offered by a plurality of lenders, the system comprising:

a database that stores loan package data specifying loan packages for home loans
offered by the lenders, the loan package data specifying, for each of the loan
packages, at least a loan type, an interest rate, and a required borrower credit
grading; and

a computer system that provides:

a first interface that allows the lenders to securely upload at least some of the
loan package data for their respective loan packages to the database
over a computer network; and

a second interface that prompts a borrower to enter personal loan evaluation
information, and invokes, on a computer, a borrower grading module
which uses at least the entered personal loan evaluation information to
calculate a credit grading for the borrower, said credit grading being
distinct from a credit score of the borrower, and being based on
underwriting criteria used by at least some of said lenders;

wherein the second interface provides functionality for the borrower to search the
database to identify a set of loan packages for which the borrower qualifies
based on the credit grading, and to compare the loan packages within the set,
including loan type and interest rate, while remaining anonymous to each of
the lenders and without having to post a request to any of the lenders, said
second interface configured to display to the borrower an indication of a total
cost of each loan package in the set, said total cost including costs of closing
services not provided by corresponding lenders;

and wherein the computer-implemented system further enables the borrower to
selectively expose at least the personal loan evaluation information to a lender
corresponding to a selected loan package.

2. The system of claim 1, wherein the second interface comprises a set of web pages of a web site.

19. A computer-implemented method, comprising:

receiving, over a computer network, personal data entered by a borrower, said personal data comprising loan evaluation data;

automatically generating or causing the generation of a credit grading for the borrower such that the credit grading is dependent upon the loan evaluation data entered by the borrower, said credit grading being distinct from a credit score obtained from a credit bureau, and being generated at least partly using underwriting criteria of one or more lenders;

identifying a set of loan packages for which the borrower qualifies based on said credit grading, each loan package including home loan information provided by a lender, and including guaranteed closing cost information for closing services not provided by the lender, wherein the set of loan packages is identified without requiring the borrower to post a request to any lender;

outputting information regarding the set of loan packages, including the guaranteed closing cost information for closing services not provided by the lender, to the borrower via a user interface that enables the borrower to at least compare total costs of the loan packages for which the borrower qualifies, said user interface additionally providing functionality for the user to select and apply for one of said loan packages; and

in response to a request from the borrower in association with a selected loan package, communicating information of the borrower to a corresponding lender.

Defendants contend that "[t]he Asserted Claims are all directed to the fundamental abstract idea of a method . . . for users to assess their borrowing ability for a loan without revealing their identities to the lenders until they are ready." (Mot. 5.)  Defendants assert that these claims fail § 101 because they "have been done before in the human mind or through use of a pen and paper when a borrower uses the mortgage rate charts found in newspapers" and are "directed to 'organizing human activity.'" (Mot. 8 (citing Coyle Decl., Dkt. No. 99-10 at ¶¶ 15-19; Koenigsberg Rep., Dkt. No. 104 at ¶¶ 37-38, 42).)  Defendants also argue that "even if the 'credit grading' is the purported 'novel' aspect" to which the claims are directed, "the claims still remain abstract ideas," because the method is "not tied to a specific structure or machine."  (*Id.*)  Defendants argue that "[t]here is no 'innovative concept' in any of the Asserted Claims that 'transforms' the abstract ideas of the claims into patent-eligible claims," because the use of the computer in the claims is "purely conventional."  (*Id.*)

Plaintiff responds that the claimed process can't be done mentally and that, to the contrary, "the point of this invention is to take the human out of the loop, removing the temptation of unscrupulous brokers to steer borrowers into mortgage programs that were the best (i.e. provided the most compensation) for the broker not the consumer." (Opp'n 8; Lebowitz Decl., Dkt. No. 117 at ¶ 28.)

### 1.2.1   **Mayo** *Step 1*

For step 1 of the *Mayo* analysis, the Court agrees with Defendants that the claims are directed to the idea of allowing users to assess their borrowing ability without revealing their identities to the lenders until they wish to do so.  For step 2 of the *Mayo* analysis, the Court agrees that the claims lack an "inventive" concept sufficient to transform that abstract idea into a patentable invention.  Plaintiff's arguments to the contrary don't account for the actual content of the claims.

As to *Mayo* step 1—the nature of the abstract idea—the claims are directed to anonymous loan shopping, and not necessarily the problem created by a mortgage originator

1   who might have a conflict of interest.  '728 Patent claim 6 contains no conflict-free

2   requirement, and nothing in the architecture of the claim prevents a conflict.  Instead, what it

3   requires is that the broker not reveal the potential borrower's information to the lender until

4   specifically authorized by the borrower.  Similarly, what the '694 Patent's claims require is not

5   an unconflicted loan broker, but instead, a system where the borrower is anonymous to the

6   lender until the borrower has been informed of the cost of the loan based on the borrower's

7   credit grading, and the borrower then chooses to expose its identity to a lender.

8          Even in a computerized human-free method, the computer could be programmed to

9   interact only with lenders that have paid to be in the system, even where better terms are

10  available to the borrower elsewhere, or to suggest terms that advantage the broker over the

11  borrower.  And even had claim 6 specified scruples, that would not show that it mandated a

12  human-free method.  It would just be a method infringed by the honest loan broker and not

13  the avaricious one.  In short, none of Plaintiff's arguments show that claim 6 is drawn to

14  something that could not be done by a person.  *See CyberSource Corp. v. Retail Decisions, Inc.*,

15  654 F.3d 1366, 1373 (Fed. Cir. 2011) ("Such a method that can be performed by human

16  thought alone is merely an abstract idea and is not patent-eligible under § 101.").

17

18          *1.2.2   Mayo Step 2*

19

20          As to *Mayo* step 2—"[w]hat else is there in the claims before us?," 132 S. Ct. at

21  1297—the claims contain no "'inventive concept'—i.e., an element or combination of

22  elements that is sufficient to ensure that the patent in practice amounts to significantly more

23  than a patent upon the [ineligible concept] itself."  *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*,

24  132 S. Ct. at 1294).  First, while Plaintiff argues that the claims cover a special system that

25  enables the human to be taken out of the loop, '728 Patent claim 6 doesn't even expressly

26  require a computer.  Instead, it describes a process "wherein steps (a)-(e) are performed by a

27  third party evaluator that does not provide the loan."  ('728 Patent 12:54-55.)  Thus, nothing

28  in the claim requires that the human "be taken out of the loop."

1      True, claim 6 requires borrower information to be received "over a network," but that

2  could be any kind of a network, including a telephone network.  Even assuming that it refers

3  to a computer network, that doesn't show the absence of a human.  For example, this Order

4  is distributed to its human readers over a network.  Nor does the limitation that personal

5  information be obtained "at least in part, via an online form" require the absence of a

6  human.  Further, "[t]hat a computer receives and sends the information over a

7  network—with no further specification—is not even arguably inventive."  *buySAFE, Inc. v.*

8  *Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *see also Ultramercial*, 772 F.3d at 716 ("the

9  use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under

10  § 101.").

11      Unlike the '728 Patent's claims, the '694 Patent's claims do expressly require the use

12  of a computer.  But like the '728 Patent's claims, the '694 Patent's claims also cover things

13  that could be done by a human.  The "interface that allows the lenders to securely upload at

14  least some of the loan package data [specifying the loan type, rate, and required borrower

15  credit grading]" ('694 Patent 17:33-34) could be hand delivery of that information on a sheet

16  of paper.  The "second interface that prompts a borrower to enter personal loan evaluation

17  information" with the "borrower grading module" ('694 Patent 17:37-39) could be the

18  human broker taking the information by hand and calculating the credit grading by hand or

19  by looking at a table.  The borrower and broker could discuss the cost of the available loans

20  and the borrower could decide to selectively expose its information to a lender of interest.

21      Nothing in the '694 Patent's claims "purport[s] to improve the functioning of the

22  computer itself."  *Alice*, 134 S. Ct. at 2359.  They do not "effect an improvement in any other

23  technology or technical field."  *Id.*  Nothing in the '694 Patent's claims covers an "inventive

24  concept" "sufficient to provide any 'practical assurance that the process is more than a

25  drafting effort designed to monopolize the [abstract idea] itself.'"  *Ultramercial*, 772 F.3d at

26  716, (quoting *Mayo*, 132 S. Ct. at 1297).  Nor do the claims solve a challenge particular to the

27  internet, which the Federal Circuit held sufficient in *DDR Holdings, LLC v. Hotels.com L.P.*,

28  No. 2013-1505, 2014 WL 6845152, *10 (Fed. Cir. Dec. 5, 2014) ("these claims stand apart

because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.").  Nor are the claims adequately tied to "particular machines."  *See DealerTrack, Inc. v. Huber*, 657 F. Supp. 2d 1152, 1156 (C.D. Cal. 2009), *aff'd*, 674 F.3d 1315 (Fed. Cir. 2012).

Therefore, the Court GRANTS summary judgment that '728 Patent claim 6 and '694 Patent claims 1, 2, and 19 are invalid for failure to satisfy 35 U.S.C. § 101.  Given this holding, the Court need not address the other issues presented by the Motion, but does so in the interest of completeness in Sections 2-5.

## 2.    NON-INFRINGEMENT OF THE '728 PATENT

### 2.1    Legal Standard

Determining patent infringement is a two step process.  *Cybor Corp. v. FAS Techs, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).  "First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device."  *Id.* (citations omitted).  Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case."  *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999)).

If the moving party meets this initial burden, the burden shifts to the party asserting infringement to set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (citation omitted).

"[A] party does not meet this evidentiary threshold merely by submitting the affidavit of an expert who opines that the accused device meets the claim limitations." *Novartis*, 271 F.3d at 1051.

"Whether an accused device or method infringes a claim either literally or under the doctrine of equivalents is a question of fact." *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001) (citing *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 731 (Fed. Cir. 1997)). "A patentee claiming infringement must present proof that the accused product meets each and every claim limitation." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001); *see Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1370 (Fed. Cir. 2000) (affirming district court's grant of summary judgment of no literal infringement in the absence of even one claim limitation).

## 2.2    Application

### 2.2.1    "'Credit Grading" and "Personal Information"

#### 2.2.1.1 Literal Infringement

Defendants contend that Plaintiff "cannot show that [ ] the required and distinct elements of 'personal information' and 'the credit grading' exist in the accused website." (Mot. 11.)  Defendants argue that "personal information" and "credit grading" are two separate and distinct terms that appear in steps (a) and (e) of claim 6 that must be infringed by different elements of the accused system.  (Mot. 13 (citing '728 Patent 1:56-58; 12:49-52); *see also* Reply 7-9.)  Plaintiff responds that overlap between "personal information" and "credit grading" does not mean that both limitations cannot be met.  (Opp'n 13.)

Plaintiff's expert, Lebowitz, identifies the infringing "credit grading" as resulting from "the combination of LTV [loan to value ratio], loan amount, and credit score."  (Lebowitz Rep., Dkt. No. 107 at ¶ 118; *see also* Walker Rep., Dkt. No. 108 at ¶ 31 ("the select statement

1    beginning at line 166 combines the parameters discussed above (FICO, LoanAmount, LTV)

2    [ ] which is used to identify lender information that affects availability and pricing of the

3    loans."); ¶ 60 ("the NYLX system[, or Costco platform,] combines LTV, PropertyValue,

4    cr.MinValue (i.e. FICO), DownPayment, among others, as parameters for pricing

5    calculations.  Such combinati[o]n is performed automatically when the user selects 'See

6    Results.'").)  Lebowitz identifies the infringing "personal information" as including, but not

7    limited to, "name, **credit score**, **home value**, down payment, **loan amount**, and phone

8    number" and "information regarding objectives of the borrower in seeking a loan."  (*Id.* at

9    ¶ 113 (emphasis added to elements that overlap with credit grading inputs).)

10        Therefore, Plaintiff has identified a set of personal information and a credit grading

11   that is generated from a subset of the personal information.  Nothing in the '728 Patent or its

12   claims requires the absence of overlap between the credit grading and the personal

13   information.  Defendants have thus not shown that they are entitled to summary judgment

14   of no literal infringement of the '728 Patent.

15

16               2.2.1.2        *Infringement Under the Doctrine of Equivalents*

17

18        Plaintiff argues that if the information transmitted to the lender in '728 Patent, claim

19   6, step (e) is not a credit grading, then it is equivalent to a credit grading.  (Opp'n 17 (citing

20   Lebowitz Rep., Dkt. No. 107 at ¶¶ 115, 118).)  Plaintiff then clarifies that its equivalence

21   theory applies only to the small part of step (e) concerning "sending the credit grading" to a

22   lender.  (Opp'n 16.)  Defendants argue that this doctrine of equivalents argument fails

23   because (1) it would vitiate the claim language and (2) it fails the function-way-result test.

24   (Mot. 16.)

25        Whether a doctrine of equivalents theory would vitiate a claim element is "a legal

26   determination that 'the evidence is such that no reasonable jury could determine two

27   elements to be equivalent.'" *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir.

28

2012).  According to Defendants, Plaintiff's doctrine of equivalents argument would vitiate the claim limitation for three reasons: (1) claim 6 requires the credit grading be generated programmatically based on objective underwriting criteria, a requirement that the equivalents theory does not account for; (2) claim 6, step (d) requires outputting information regarding credit grading to the borrower, but the doctrine of equivalents theory has the grading generated later, by the lender, in step (e), and (3) credit grading must be distinct from personal information, but the equivalents theory conflates them.  (Mot. 16-17.)

None of these arguments establish Defendants' entitlement to summary judgment. First, Defendants have not explained why the doctrine of equivalents theory vitiates the limitation of programmatically generating a credit grading using objective underwriting criteria.  Second, the step (d) argument is puzzling: the credit grading is generated in step (c). Information regarding the grading is outputted to the borrower in step (d), and if the borrower wants, to the lender in step (e).  It is unclear how it would be the case, as Defendants argue, that if something equivalent to the credit grading, rather than the credit grading itself, were sent to the lender in step (e), that it would be impossible for information regarding something equivalent to the credit grading to be outputted to the borrower in step (d).  Third, for the reasons discussed in Section 2.2.1.1, overlap between the personal information and the information used to generate the credit grading does not show non-infringement.

Therefore, Defendants have not shown that Plaintiff's theory vitiates the claim limitations in question.  The Court now moves to Defendants' second argument: that Plaintiff's equivalents theory fails the "function-way-result" test.

"That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way." *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 n.6 (Fed. Cir. 1987).  Defendants argue that Lebowitz incorrectly identifies the function

of the credit grading as "allow[ing] the lender to evaluate the credit worthiness of a given borrower," but that the '728 Patent's specification makes clear that the purpose of the credit grading was to provide the borrower with an evaluation of his borrowing ability.  (Mot. 18 (quoting Lebowitz Rep., Dkt. No. 107 at ¶ 118).)

Defendants read too much into Lebowitz's equivalents theory.  Lebowitz's report states that (1) a credit grading is the combination of loan-to-value, loan amount, and credit score, and (2) the potentially equivalent information sent to the lender is the credit range, loan amount, and home value, which serves substantially the same function as using a credit grading.  (Lebowitz Rep., Dkt. No. 107 at ¶ 118.)  This is because "[t]he Credit Range provides the lender with an approximation of the borrower's FICO score . . ." and "LTV can be calculated using the Loan Amount and Home Value  . . ." leading to "the same result as the use of a credit grading."  (Lebowitz Rep., Dkt. No. 107 at ¶ 118.)  Whether that potentially equivalent information is used on the lender end or the buyer end of the system, Plaintiff has explained why it is equivalent to a credit grading.

Therefore, Defendants have not shown that Plaintiff's theory fails the function-way-result test.

### 2.2.2   '"Underwriting Criteria"

Defendants argue that Plaintiff has no evidence that the accused method meets the requirement of '728 Patent step (b) of "selecting, based on said information regarding objectives of the borrower, underwriting criteria to be used to generate a credit grading for the borrower."  (Mot. 19 (emphasis omitted).)  Defendants argue that Plaintiff's expert, Walker, merely refers to a broad eight page section of the specification regarding "parameters," which are all borrower information, not lender underwriting criteria.  (Mot. 20.)  While Walker does acknowledge that lenders can upload lender information retrieved during the loan pricing analysis, Defendants argue that Walker: (1) never ties this to the credit

grading step; (2) never explains when, where, or how the lender information is later retrieved, and (3) does not tie this to step (b) of claim 6.  (Mot. 21 (citing Walker Report, Dkt. No. 108 at ¶ 33).)  In a responsive declaration submitted with Plaintiff's opposition, Walker points out where his report shows that step (b) is satisfied by the accused software.  (Walker Decl. in Supp. of Opp'n, Dkt. No. 126 at ¶¶ 6-12.)  Walker's report discusses in detail the platform's use of information entered by the borrower to calculate loan offers.  (Walker Rep., Dkt. No. 108 at ¶¶ 9-17, 23; *see also* '728 Patent 1:56-58; 12:38-45, 62-64.)

As shown by Defendants' Reply, this issue turns on the interpretation of source code quoted in Walker's Report, and the use of an "AND" connector to join certain database fields, including "TransactionTypeID," "MaxLTV," and "MinCredit."  (Reply 13.)  The Court is not in a position to say that Walker's reasoned and factually-specific interpretation is incorrect as a matter of law.  Therefore, there is a genuine issue of material fact as to whether the borrower-submitted information is underwriting criteria.

### 2.3    Conclusion

The Court DENIES the Motion as to non-infringement of the '728 Patent.

## 3.    NON-INFRINGEMENT OF THE '694 PATENT

Defendants argue that Plaintiff fails to establish that the Defendants' website contains certain elements of claims 1, 2, and 19: "that (1) lenders are provided with the ability to 'securely upload' data, (2) anonymity exists at any time for the borrower from all of the lenders, or (3) underwriting criteria used by one or more lenders are used to generate or calculate [a] credit grading."  (Mot. 22.)  Here, the underwriting criteria fails for the same reason as for the '728 Patent, so the Court does not address it further in this Section.

### 3.1    "Securely Upload"

Defendants focus on the limitation present in claim 1 requiring the capability for lenders to "securely upload at least some of the loan package data."  Defendants argue that their system provides no capability to "upload" anything (as opposed to manually entering data), nor is their system actually "secure," because the information can be readily viewed and edited by Defendant First Choice.  (Mot. 24 (citing Pollack Rep., Dkt. No. 109 at ¶ 48, 152, 154; Koenigsberg Rep., Dkt. No. 104 at ¶ 128).)  The Court addresses the "securely" and "upload" aspects of this limitation in turn.

### 3.1.1   *"Securely"*

As to Defendants' argument that the upload is insecure because First Choice has access to the data, first, it is undisputed that users enter a username and password to access the website.  (Lebowitz Rep., Dkt. No. 107 at ¶¶ 78-80 ("a lender must provide a user name and log in before access can be granted" . . . "the use of unique logins and passwords is a commonly accepted way of ensuring security in web based systems"); Walker Rep., Dkt. No. 108 at ¶¶ 47-48 ("When lenders log into the accused system, they must provide credentials such as a user name and password.  A POSITA . . . would understand that the requirement of providing credentials in order to access a site (and upload underwriting criteria) would mean that the uploading process is secure and confidential.").

Second, Defendants fail to establish that First Choice's access means an absence of security.  Defendants do not show that, even under their definition, the upload itself is insecure, as opposed to the security of the data after the upload.  Thus, Defendants only argue that First Choice can alter the data **after** it has been uploaded.  (Mot. 24.)  Also, the process of limiting the availability of information to certain users, as Defendants do, is itself

1   an indication of security.  (Koenigsberg Rep., Dkt. No. 104 at ¶ 129 ("managers can see

2   more information than other users").)

3        Third, First Choice's access to the data does not show insecurity.  It is usually the case

4   that the entity with authority for a secure location has access to it.  The Courthouse is not

5   insecure because the U.S. Marshals who secure it have keys to all of the doors.  Defendants

6   present the testimony of a First Choice employee who states that First Choice uses its access

7   to the other lenders' data to maintain quality control.  (Koenigsberg Rep., Dkt. No. 104 at ¶

8   128.)  There is nothing "insecure" about data that is so used, and the Court does not

9   understand First Choice to be arguing that it uses its access for improper purposes.

10       As to the question of whether an "upload" occurs at all, the parties agree that lenders

11   input information on a screen and that the information is transferred to First Choice, but

12   disagree about whether that constitutes an "upload."  Where the parties "present a

13   fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."

14   *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

15       The claim requires "a first interface that allows the lenders to securely upload at least

16   some of the . . . loan packages to the database over a computer network."  ('694 Patent claim

17   1.)  The specification only uses the term "upload" twice, once in the label for the "loan

18   package upload module" in Figure 4, and once in the following sentence: "After applicable

19   loan programs have been determined by the user, the loan program data can be uploaded to

20   the borrower computer and be displayed via the borrower Web site 404."  ('694 Patent

21   15:10-13.)  Neither of these uses is particularly instructive.

22       Defendants rely on eight dictionary definitions.  (Dkt. No. 99-20.)  They are:

23

24        1. Dictionary.com: "to transfer (software, data, character sets, etc.)

25        from a smaller to a larger computer."

26

27

28

2. Merriam-Webster: "*computers*: to move or copy (a file, program, etc.) from a computer or device to a usually larger computer or computer network."

3. PC.net: "While downloading is receiving a file from another computer, uploading is the exact opposite.  It is sending a file from your computer to another system.  Pretty straight forward.  It is possible to upload and download at the same time, but it may cause slower transfer speeds, especially if you have a low bandwidth connection.  Because most files are located on Internet servers, people generally do a lot more downloading than uploading."

4. TechTerms.com: [duplicate of PC.net].

5. Webopedia: "To transmit data from a computer to a bulletin board service, mainframe, or network.  For example, if you use a personal computer to log on to a network and you want to send files across the network, you must upload the files from your PC to the network."

6. Macmillan Dictionary: "to send documents or programs from your computer to a larger system using the Internet."

7. Oxford Dictionary of British and World English: "Transfer (data) from one computer to another, typically to one that is larger or remote from the user or functioning as a server: 'you can upload your prepared text' 'software is uploaded and downloaded.'"

8. About.com: "An upload involves sending a copy of a file to a remote network location.  For example, Web publishers upload files to their Web server."

Defendants do not attempt to show that these dictionary definitions are from the time of the invention, such that they would be evidence of the meaning "that the term would

have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). But even keeping that defect in Defendants' evidence in mind, many of the definitions Defendants cite do not require an entire "file" to be sent, and instead recognize that transferring "data" constitutes an upload. So even based only on Defendants' proffered definitions, "upload" is not limited to transfer of files, but includes transfer of data.

While not disagreeing with Defendants' definitions, Plaintiff also submits a definition from The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000), which is superior to Defendants' proffered definitions because (1) it is a technical dictionary, *see Phillips*, 415 F.3d at 1318, and (2) it is from the time of the invention. *See id.* at 1313. The IEEE Dictionary provides the following definition: "(A) To transfer some collection of data from some storage location to a computer memory. (B) To transfer some collection of data from the memory of a small computer to the memory of a relatively large computer; for example, to transfer data from a microcomputer to a mainframe computer." (Opp'n 22; Walker Decl., Dkt. No. 126 at ¶ 13, Ex. 2.) This further supports Plaintiff's position that Defendants' system involves uploading.

Defendants have therefore not shown that they do not practice the "securely uploading" requirement of the claims.

### 3.2    Anonymity

Defendants argue that they do not meet the "anonymous" requirement because the borrower's information is provided to First Choice and Costco during the shopping process, so the borrower is not anonymous before selecting a lender. (Mot. 24.) Defendants argue that First Choice has "immediate access" to the complete borrower-entered information regardless of whether First Choice is selected as a lender. (Mot. 25-26 (citing Dkt. No. 106 at

1  1-2, 60-61, 64-65; Lebowitz Rep., Dkt. No. 107 at ¶¶ 72, 86; *see also* Pollack Rep., Dkt. No.

2  109 at ¶ 61).)

3         Disputed issues of material fact preclude entry of summary judgment on this

4  limitation.  The accused platform itself informs users that "[t]he information entered by

5  Costco members will only be shared with the lenders you request a quote from."  (Lebowitz

6  Rep., Dkt. No. 107 at ¶ 119.)  The testimony on this issue is potentially in conflict.  *Compare*

7  Lebowitz Rep. Dkt. 107 at ¶¶ 72, 86 ("First Choice has access to borrower information.

8  That information is not disclosed to First Choice or any other lender during the borrower's

9  evaluation and comparison of different loan packages.") *with* Alexander Tr., Dkt. No. 127 at

10  44:8-16 (First Choice has access to borrower information before selecting a lender.).

11         While First Choice may have access to the data, Defendants have not established that

12  First Choice always uses that data in violation of the promise it makes to its customers.  And

13  even if it occasionally violates that promise (Defendants emphasized testimony from its

14  employee, Alexander, who stated that First Choice "usually" looks at the data in aggregate

15  format, which would maintain anonymity, Reply 16; Alexander Tr., Dkt. No. 127 at 44:21-

16  45:20), that would not show that Defendants never infringe.

17         Defendants have therefore not shown that they do not practice the anonymity

18  requirement of the claims.

19

20  **3.3    Conclusion**

21

22  The Court DENIES the Motion as to non-infringement of the '694 Patent.

23

24  **4.    INDUCED INFRINGEMENT BY COSTCO**

25

26  **4.1    Legal Standard**

27

28

A person who "actively induces" another to infringe a patent is liable as an infringer under 35 U.S.C. § 271(b).  "To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they 'actively and knowingly aid[ed] and abett[ed] another's direct infringement.'"  *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (emphasis and citation omitted).  "It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement."  *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).

"[S]pecific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement."  *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1342 (Fed. Cir. 2008).  It can be shown by the defendant's receipt of a charge of infringement by the plaintiff.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 489-491 (1964).  And that charge of infringement can be made by service of a complaint.  *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1345 (Fed. Cir. 2012).

## 4.2    Application

Defendants argue that Plaintiff only accuses Costco of induced infringement under 35 U.S.C. § 271(b), but with no evidence that Costco encouraged the direct infringement of the Asserted Patents.  (Mot. 29.)  Plaintiff only asserts direct infringement against NYLX, not the Costco members who are the direct infringers in Defendants' framing of the issue.  (Mot. 30-31 (citing Dkt. No. 99-5 at 2).)  Count three of the Second Amended Complaint alleged that Costco provides through its website "mortgage loan services provided through an arrangement with First Choice and NYLX" and that "Costco has induced others, including at least NYLX and Costco's members, to directly infringe the '694 and '728 patents [by]

1  encouraging them to shop for mortgages using the infringing NYLX pricing engine through

2  www.costco.com." (Dkt. No. 33 at ¶¶ 30-31.)

3      The induced infringement theory here is simple and adequate. Plaintiff is now

4  pursuing a direct infringement case only against NYLX, not Costco's members. But NYLX

5  allegedly infringes by performing the accused method or operating the accused system for

6  Costco's members. While Costco does not itself directly infringe, it induces the alleged

7  infringement by actively recruiting its members and directing them to NYLX through

8  Costco's website, pursuant to the agreement between the Defendants. For each customer

9  that Costco provides, NYLX runs the accused method on the accused system. Defendants

10  have not shown any defect in the theory that in doing so, Costco actively induces NYLX's

11  infringement.

12      The Court DENIES the Motion as to no induced infringement by Costco.

13

14  **5.    DIVIDED INFRINGEMENT OF METHOD CLAIMS**

15

16      **5.1    Legal Standard**

17

18      "[W]here the actions of multiple parties combine to perform every step of a claimed

19  method, the claim is directly infringed only if one party exercises 'control or direction' over

20  the entire process such that every step is attributable to the controlling party, i.e., the

21  'mastermind.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (citing

22  *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380-81 (Fed. Cir. 2007)). In *Limelight*

23  *Networks, Inc. v. Akamai Technologies, Inc.*, the Supreme Court held that the rules for divided

24  infringement apply equally to both direct and indirect infringement claims, and that because

25  "*Muniauction* (which, again, we assume to be correct) instructs that a method patent is not

26  directly infringed . . . unless a single actor can be held responsible for the performance of all

27  steps of the patent," that an indirect infringement claim requires a single direct infringer. 134

28

S. Ct. 2111, 2119 (2014).  Thus, for any type of infringement claim, the patentee must show that a single actor practices every limitation of the asserted claims.

### 5.2    Application

Claim 6 of the '728 Patent and claim 19 of the '694 Patent are the method claims asserted against Defendants.  (Mot. 32.)  Defendants argue that no single party performs every step of the claims, and that Plaintiff has failed to show the necessary control for NYLX to be liable for direct infringement under a divided infringement option.  (Mot. 32, 35.)  Defendants assert that the claims require a borrower, and that the borrower must be in possession of the borrower's data.  (Mot. 34 (citing '728 Patent Figs. 2A, 2B; 2:38-39; 3:31-34; 4:52-58; 5:1-5, 37-40, 51-58, 66-67; 8:59-61; 12:30; '694 Patent Figs. 2A, 2B, 3; 2:34-36, 48-50; 4:66-5:9; 7:1-3; 10:3-8).)  Plaintiff responds that when claims, as drafted, "place all of the processing steps on a single party, incidental interactions with users should not create divided infringement."  (Opp'n 29-30.)

Plaintiff is right.  Claim 6 of the '728 Patent and claim 19 of the '694 Patent do not present any divided infringement problems.  Each step of each claim is an action performed by the third party evaluator, not by the borrower:

19. A computer-implemented method, comprising:

**receiving**, over a computer network, personal data entered by a borrower, said personal data comprising loan evaluation data;

**automatically generating or causing the generation** of a credit grading for the borrower such that the credit grading is dependent upon the loan evaluation data entered by the borrower, said credit grading being

distinct from a credit score obtained from a credit bureau, and being

generated at least partly using underwriting criteria of one or more

lenders;

**identifying** a set of loan packages for which the borrower qualifies based on

said credit grading, each loan package including home loan information

provided by a lender, and including guaranteed closing cost information

for closing services not provided by the lender, wherein the set of loan

packages is identified without requiring the borrower to post a request

to any lender;

**outputting** information regarding the set of loan packages, including the

guaranteed closing cost information for closing services not provided

by the lender, to the borrower via a user interface that enables the

borrower to at least compare total costs of the loan packages for which

the borrower qualifies, said user interface additionally providing

functionality for the user to select and apply for one of said loan

packages; and

in response to a request from the borrower in association with a selected loan

package, **communicating** information of the borrower to a

corresponding lender.

'694 Patent claim 19 (emphasis added); *see also* '728 Patent claim 6 (similarly requiring a single party to "receiv[e]," "generat[e]," "select[ ]," "output[ ]," and "send[ ]" information.).

Thus, this case is not like *Muniauction*, where one step required a bidder to input information, while the majority of the remaining steps required actions by the auctioneer. 532 F.3d at 1328-29. Indeed, as Plaintiff notes, the claims here follow the Federal Circuit's express guidance on avoiding claims drafted to require multiple infringers:

1   The concerns over a party avoiding infringement by arms-length cooperation can

2   usually be offset by proper claim drafting.  A patentee can usually structure a claim to

3   capture infringement by a single party.  *See* Mark A. Lemley et al., *Divided Infringement*

4   *Claims*, 33 AIPLA Q.J. 255, 272-75 (2005).  In this case, for example, BMC could have

5   drafted its claims to focus on one entity.  **The steps of the claim might have**

6   **featured references to a single party's supplying or receiving each element of**

7   **the claimed process.**  However, BMC chose instead to have four different parties

8   perform different acts within one claim.  BMC correctly notes the difficulty of

9   proving infringement of this claim format.  Nonetheless, this court will not

10  unilaterally restructure the claim or the standards for joint infringement to remedy

11  these ill-conceived claims.

12

13  *BMC*, 498 F.3d at 1381 (Fed. Cir. 2007) (emphasis added), overruled on other grounds by *Akamai*

14  *Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012), in turn overruled by *Limelight*

15  *Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014).

16      The claims here are drafted exactly as *BMC* stated would avoid the divided infringement

17  problem.  The claims recite elements requiring only the actions of one entity to infringe.  *See also*

18  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) ("That other parties are

19  necessary to complete the environment in which the claimed element functions does not necessarily

20  divide the infringement between the necessary parties.  For example, a claim that reads 'An

21  algorithm incorporating means for receiving e-mails' may require two parties to function, but could

22  nevertheless be infringed by the single party who uses an algorithm that receives e-mails.").

23      Therefore, the Court DENIES the Motion as to divided infringement.

24

25

26

27

28

**DISPOSITION**

For the foregoing reasons, the Motion is GRANTED IN PART. The '728 and '694 Patents are invalid under 35 U.S.C. § 101. The Motion is otherwise DENIED.

IT IS SO ORDERED.

DATED: January 12, 2015

_____

Andrew J. Guilford
United States District Judge